**2013-5019**

# United States Court of Appeals
# for the Federal Circuit

Alley's of Kingsport, Inc., Arrow Ford, Inc., Axelrod Chrysler Dodge Jeep, Inc., Axelrod Chrysler, Inc., Barry Dodge Inc., Bennett AutoPlex Inc., Benson Motor Inc., Bob Taylor Jeep, Inc., Bondy's Ford, Inc., Brother's Motors, Inc., Cardenas Motors, Inc., Carson Automotive Inc., CDOHY, Inc., Crain CDJ, LLC, Cunningham Chrysler Jeep, Inc., Curfin Investments, Inc., DET Automotive Group, Inc., DJ-Mack Inc., Don Phillips & Son Sr. Enterprises, Inc., Douglas Automotive Group, Inc., Ertley Chrysler Jeep Dodge, LLC, Fitzgerald Auto Malls, Inc., FT Automotive II, LLC, FT Automotive IV, LLC, G.K. Alcombrack, Inc., Golden Motors, Inc., Hahn Motor Company, Hoover Motors Holding Co., Inc., Hoover Dodge, Inc., I.M. Jarrett & Son, Inc., Jeff Hunter Motors, Inc., Johnson County Motors, L.C., Bill Kay Suzuki, Inc., Kingston Dodge, Inc., LFCJ, Inc., Mancari's of Orland Hills, Inc., Marketplace Suzuki, Inc., Marstaller Motors, Inc., Melchiorre, Inc., Miller-Campbell Company, Miller Motor Car Corporation, Milner O'Quinn Chrysler Dodge Jeep, Inc., Morong Brunswick, Neil Huffman Enterprises, Inc., Neil Huffman, Inc., Painter Sales and Leasing, Painter's Sun Country Chrysler, Inc., Pen Motors, Inc., Pleasant Valley Motors, Inc., Preston Chrysler Jeep, Inc., Pride Chrysler Jeep, Inc., Reuther Dodge LLC, Reuther's Investment Company, RFJS Company, LLC, SCK, Inc., Scotia Motors, Inc., Shoemaker Auto Group, Inc., South Shore Auto lines, Inc., Star Chrysler, Inc., Tamaroff 12 Mile Motors, Inc., Tarbox Chrysler Jeep, LLC, Tarbox Motors Inc., Tenafly Chrysler Jeep, Inc., The Union Sales Company, Thomas Sales & Service, Inc., Verona Motor Sales, Inc., Waco Dodge Sales, Inc., Walker Motors, Inc., Westminster Dodge, Inc., Wheaton Motor City, Inc., Wheeler Leasing Co. II, Inc., Whitey's, Inc., William T. Pritchard, Inc., Wyckoff Chrysler, Inc., Young Volkswagen, Inc., A&D Auto Sales, Inc., Archer Chrysler Jeep West, Inc., Archer Chrysler Plymouth, Inc., Archer Dodge, Inc., Archer Financial Holdings, Inc., Boardwalk Auto Center, Inc., Bob Luegers Motors, Inc., Bob Rohrman Motors, Inc., Burke Automotive Group, Inc., Burke Brothers, Inc., By Fishel's Jeeps, Inc., Carson CJ, LLC; Century Dodge, Inc., Chilson, Inc., Clarkston Motors, Inc., Coleman Auto Group, Inc., Coleman Chrysler Jeep, Inc., Country Motors, Inc., Dave Croft Motors, Inc., Dodge of Englewood, Inc., Don Drennen Chrysler Jeep, Inc., Donato & Son's Jeep, Inc., EJE, Inc., El Dorado Motors, Inc., Elhart Dodge, Inc., Elhart Pontiac-GMC Truck, Inc., Fort Morgan Auto Center, Inc., Fox Hills Motor Sales, Inc., Grayson Pontiac, Inc., Gresham Chrysler Jeep, Inc., Grubbs Nissan Mid-Cities Limited, Hamilton Chrysler, Inc., Harvey M. Harper Co., Island Jeep, Inc., James W. Halterman, Inc., Jelmac LLC, Jim Marsh American Corporation, John Cullen Dodge, LLC, Kitagawa Motors, Inc., Kovatch Ford, Inc., Lee Peterson Motors, Inc., Lenihan Jeep, Inc., Livonia Chrysler Jeep, Inc., Lunt Motor Company, Manuel Dodge, Ltd., Matt Montgomery, Inc., Matthews Chrysler, Inc., Mt. Clemens Dodge, Inc., New City Auto Sales, Inc., Northglenn Dodge, Inc., Quality Jeep-Chrysler, Inc., Rhoden Auto Center, Inc., Richard Chrysler Jeep, Inc., Riverside Auto Sales of Marquette, Inc., Rock of Texas Automotive, Inc., Rohr-Alpha Motors, Inc., Scott Chevrolet, Inc., Siemans Imports, Inc., Southeast Automotive, Inc., Taylor & Sons, Inc., Ted Britt of Fredericksburg, Inc., Teton Motors, Inc., Tomsic Motor Company, Transit LLC, Tri-State Automotive Associates, Inc., Urka Auto Center, Inc., Valley Dodge, Inc., Vic Osman Lincoln-Mercury, Inc., Village Chrysler Jeep, Inc., Wallace Chrysler Jeep, LLC, Westside Dodge, Inc., Wright Dodge, LLC, and Lou Bachrodt Chevrolet, Inc.,

*Plaintiffs-Appellees,*

*v.*

UNITED STATES

*Defendant-Appellant.*

*Appeal from the United States Court of Federal Claims in case no.*
*11-CV-0100, Senior Judge Robert H. Hodges, Jr.*

## BRIEF OF PLAINTIFFS-APPELLEES

*Of counsel:*
LEONARD A. BELLAVIA
BELLAVIA GENTILE & ASSOCIATES, LLP
200 Old Country Road Suite 400
Mineola, NY 11501
(516) 873-3000

NANCIE G. MARZULLA
ROGER J. MARZULLA
MARZULLA LAW, LLC
1150 Connecticut Avenue, NW, Suite 1050
Washington, DC 20036
(202) 822-6760

*Counsel for Appellees*

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellees certifies the following:

1.    The name of every party or amicus curiae represented by me is:

Alley's of Kingsport, Inc., Arrow Ford, Inc., Axelrod Chrysler Dodge Jeep, Inc., Axelrod Chrysler, Inc., Barry Dodge Inc., Bennett AutoPlex Inc., Benson Motor Inc., Bob Taylor Jeep, Inc., Bondy's Ford, Inc., Brother's Motors, Inc., Cardenas Motors, Inc., Carson Automotive Inc., CDOHY, Inc., Crain CDJ, LLC, Cunningham Chrysler Jeep, Inc., Curfin Investments, Inc., DET Automotive Group, Inc., DJ-Mack Inc., Don Phillips & Son Sr. Enterprises, Inc., Douglas Automotive Group, Inc., Ertley Chrysler Jeep Dodge, LLC, Fitzgerald Auto Malls, Inc., FT Automotive II, LLC, FT Automotive IV, LLC, G.K. Alcombrack, Inc., Golden Motors, Inc., Hahn Motor Company, Hoover Motors Holding Co., Inc., Hoover Dodge, Inc., I.M. Jarrett & Son, Inc., Jeff Hunter Motors, Inc., Johnson County Motors, L.C., Bill Kay Suzuki, Inc., Kingston Dodge, Inc., LFCJ, Inc., Mancari's of Orland Hills, Inc., Marketplace Suzuki, Inc., Marstaller Motors, Inc., Melchiorre, Inc., Miller-Campbell Company, Miller Motor Car Corporation, Milner O'Quinn Chrysler Dodge Jeep, Inc., Morong Brunswick, Neil Huffman Enterprises, Inc., Neil Huffman, Inc., Painter Sales and Leasing, Painter's Sun Country Chrysler, Inc., Pen Motors, Inc., Pleasant Valley Motors, Inc., Preston Chrysler Jeep, Inc., Pride Chrysler Jeep, Inc., Reuther Dodge LLC, Reuther's Investment Company, RFJS Company, LLC, SCK, Inc., Scotia Motors, Inc., Shoemaker Auto Group, Inc., South Shore Auto lines, Inc., Star Chrysler, Inc., Tamaroff 12 Mile Motors, Inc., Tarbox Chrysler Jeep, LLC, Tarbox Motors Inc., Tenafly Chrysler Jeep, Inc., The Union Sales Company, Thomas Sales & Service, Inc., Verona Motor Sales, Inc., Waco Dodge Sales, Inc., Walker Motors, Inc., Westminster Dodge, Inc., Wheaton Motor City, Inc., Wheeler Leasing Co. II, Inc., Whitey's, Inc., William T. Pritchard, Inc., Wyckoff Chrysler, Inc., Young Volkswagen, Inc., A&D Auto Sales, Inc., Archer Chrysler Jeep West, Inc., Archer Chrysler Plymouth, Inc., Archer Dodge, Inc., Archer Financial Holdings, Inc., Boardwalk Auto Center, Inc., Bob Luegers Motors, Inc., Bob Rohrman Motors, Inc., Burke Automotive Group, Inc., Burke Brothers, Inc., By Fishel's Jeeps, Inc., Carson CJ, LLC; Century Dodge, Inc., Chilson, Inc., Clarkston Motors, Inc., Coleman Auto Group, Inc., Coleman Chrysler Jeep, Inc., Country Motors, Inc., Dave Croft Motors, Inc., Dodge of Englewood,

Inc., Don Drennen Chrysler Jeep, Inc., Donato & Son's Jeep, Inc., EJE, Inc., El Dorado Motors, Inc., Elhart Dodge, Inc., Elhart Pontiac-GMC Truck, Inc., Fort Morgan Auto Center, Inc., Fox Hills Motor Sales, Inc., Grayson Pontiac, Inc., Gresham Chrysler Jeep, Inc., Grubbs Nissan Mid-Cities Limited, Hamilton Chrysler, Inc., Harvey M. Harper Co., Island Jeep, Inc., James W. Halterman, Inc., Jelmac LLC, Jim Marsh American Corporation, John Cullen Dodge, LLC, Kitagawa Motors, Inc., Kovatch Ford, Inc., Lee Peterson Motors, Inc., Lenihan Jeep, Inc., Livonia Chrysler Jeep, Inc., Lunt Motor Company, Manuel Dodge, Ltd., Matt Montgomery, Inc., Matthews Chrysler, Inc., Mt. Clemens Dodge, Inc., New City Auto Sales, Inc., Northglenn Dodge, Inc., Quality Jeep-Chrysler, Inc., Rhoden Auto Center, Inc., Richard Chrysler Jeep, Inc., Riverside Auto Sales of Marquette, Inc., Rock of Texas Automotive, Inc., Rohr-Alpha Motors, Inc., Scott Chevrolet, Inc., Siemans Imports, Inc., Southeast Automotive, Inc., Taylor & Sons, Inc., Ted Britt of Fredericksburg, Inc., Teton Motors, Inc., Tomsic Motor Company, Transit LLC, Tri-State Automotive Associates, Inc., Urka Auto Center, Inc., Valley Dodge, Inc., Vic Osman Lincoln-Mercury, Inc., Village Chrysler Jeep, Inc., Wallace Chrysler Jeep, LLC, Westside Dodge, Inc., Wright Dodge, LLC, and Lou Bachrodt Chevrolet, Inc.,

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus curiae represented by me in the trial court or agency or are expected to appear in this court are:

Nancie G. Marzulla, Roger J. Marzulla, Marzulla Law, LLC; Thomas A. Holman, Holman Law, P.C.; Leonard A. Bellavia, Bellavia, Blatt, Andron & Crossett, PC.

# Table of Contents

Certificate of Interest ............................................................... i

Table of Authorities ................................................................ vi

Statement of Related Cases .................................................... xiii

Brief of Plaintiffs-Appellees .................................................... 1

    Statement of the Issues ...................................................... 4

        Rule 12(b)(6) ................................................................ 4

        Property rights issues .................................................. 4

        Takings issues.............................................................. 4

        Collateral estoppel...................................................... 5

    STATEMENT OF THE CASE ................................................ 5

    STATEMENT OF THE FACTS .............................................. 6

    SUMMARY OF THE ARGUMENT ....................................... 10

    ARGUMENT........................................................................ 14

        I.    The Government's arguments in this appeal conflict with the Rule 12(b)(6) standards established by this Court and the Supreme Court ...................................................... 14

            A.    The Government improperly fails to take the allegations of the complaint as true ................................................. 16

            B.    The opinion of the Bankruptcy Court cannot supply new facts on which to base the Government's motion to dismiss ......................................................... 18

C.      Should this Court find the complaint deficient, it should direct the trial court to allow the Dealers to amend to cure that deficiency .................................................................21

II.    The Dealers have alleged that they possessed constitutionally protected property rights in their franchises ...........................22

A.      Franchise agreements (contracts) are property ..............23

B.      The Dealers' franchise business and vehicle inventory, service equipment, buildings, and other assets are also property ........................................................................26

C.      There is nothing in the bankruptcy statute that negates the conclusion that the Dealers' franchise agreements or businesses are compensable property rights ...................28

III.    The Dealers' complaint alleges governmental action constituting a Fifth Amendment taking ....................................33

A.      The complaint alleges governmental action amounting to a Fifth Amendment taking of the Dealers' franchises....37

B.      The Government's argument that it was not acting in a sovereign capacity when it took the Dealers' franchises contradicts the well-pleaded allegations of the complaint and is not supported by the cases the Government cites ............................................................42

C.      The Government's intentional destruction of the Dealers' franchises is a taking under *Omnia* ................................46

D.      The Government's allegation that Chrysler was acting within its own discretion raises an issue of fact and contradicts the complaint................................................49

E.    The Dealers have alleged the elements of a takings claim and that is all that is required for their claim to go forward..........................................................................52

CONCLUSION ....................................................................................................54

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# Table of Authorities

**Cases**                                                               **Page(s)**

*Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*,
   988 F.2d 1157 (Fed. Cir. 1993) ................................................................. 18, 50

*Alaska Airlines, Inc. v. Johnson*,
   8 F.3d 791 (Fed. Cir. 1993) ................................................................................44

*Am. Contractors Indem. Co. v. United States*,
   570 F.3d 1373 (Fed. Cir. 2009) ........................................................................11

*Am. Pelagic Fishing Co. v. United States*,
   379 F.3d 1363 (Fed. Cir. 2004) ............................................................... passim

*Anaheim Gardens v. United States*,
   444 F.3d 1309 (Fed. Cir. 2006) ..................................................................... 8, 16

*Ark. Game & Fish Comm'n v. United States*,
   133 S. Ct. 511 (2012)........................................................................................22

*Armstrong v. United States*,
   364 U.S. 40 (1960)................................................................................... passim

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................. passim

*B & G Enters., Ltd. v. United States*,
   220 F.3d 1318 (Fed. Cir. 2000) ........................................................................51

*Bair v. United States*,
   515 F.3d 1323 (Fed. Cir. 2008) ........................................................................32

*Bajwa v. Sunoco, Inc.*,
   320 F. Supp. 2d 454 (E.D. Va. 2004) ..............................................................26

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................... 15, 16

*Boise Cascade Corp. v. United States,*
    296 F.3d 1339 (Fed. Cir. 2002) ..................................................... 13, 42

*Cambridge v. United States,*
    558 F.3d 1331 (Fed. Cir. 2009) ..................................................... passim

*Carlson v. Vill. of Union City,*
    601 F. Supp. 801 (W.D. Mich. 1985) ..................................................26

*Chapman Law Firm Co. v. Greenleaf Constr. Co.,*
    490 F.3d 934 (Fed. Cir. 2007) ..........................................................15

*Cienega Gardens v. United States,*
    331 F.3d 1319 (Fed. Cir. 2003) ........................................................24

*Copeland v. Merrill Lynch & Co.,*
    47 F.3d 1415 (5th Cir. 1995) ...........................................................20

*Edgar v. United States,*
    145 Ct. Cl. 9 (1959) .......................................................................19

*Erosion Victims of Lake Superior Regulation v. United States,*
    833 F.2d 297 (Fed. Cir. 1987) ..........................................................51

*Foman v. Davis,*
    371 U.S. 178 (1962)........................................................................21

*Foss v. Nat'l Marine Fisheries Serv.,*
    161 F.3d 584 (9th Cir. 1998) ...........................................................32

*Gould, Inc. v. United States,*
    67 F.3d 925 (Fed. Cir. 1995) ...........................................................16

*Gould, Inc. v. United States,*
    935 F.2d 1271 (Fed. Cir. 1991) .................................................. passim

*Heir v. Del. River Port Auth.,*
    218 F. Supp. 2d 627 (D.N.J. 2002)....................................................26

*In re Chrysler LLC*,
   405 B.R. 84 (S.D.N.Y. 2009)..............................................................21

*In re S. Bay Expressway, L.P.*,
   434 B.R. 589 (Bankr. S.D. Cal. 2010)...............................................25

*Ind. State Police Pension Trust v. Chrysler, LLC*,
   556 U.S. 960 (2009)....................................................... 12, 20

*International News Serv. v. Associated Press*,
   248 U.S. 215 (1918)..............................................................23

*Int'l Paper Co. v. United States*,
   282 U.S. 399 (1931)................................................... passim

*Kaiser Aetna v. United States*,
   444 U.S. 164 (1979)..............................................................23

*Kam-Almaz v. United States*,
   682 F.3d 1364 (Fed. Cir. 2012) ...................... 13, 36, 42, 49

*Kelo v. City of New London*,
   545 U.S. 469 (2005)....................................................... 14, 43

*Kimball Laundry Co. v. United States*,
   338 U.S. 1 (1949)............................................................... 26, 27

*Lansing Township v. City of Lansing*,
   97 N.W.2d 128 (Mich. 1959)..............................................26

*Lingle v. Chevron U.S.A., Inc.*,
   544 U.S. 528 (2005)..............................................................44

*Long Island Water-Supply Co. v. City of Brooklyn*,
   166 U.S. 685 (1897)..............................................................24

*Loretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982)............................................................2, 5

*Louisville Joint Stock Land Bank v. Radford*,
   295 U.S. 555 (1935)........................................................................ 33, 36, 41, 48

*Lucas v. South Carolina Coastal Council*,
   505 U.S. 1003 (1992)...........................................................................29

*Lynch v. United States*,
   292 U.S. 571 (1934)............................................................................23

*McGuire v. United States*,
   707 F.3d 1351 (Fed. Cir. 2013) ..................................................... 11, 19

*Mich. State Highway Comm'n v. L&L Concession Co.*,
   31 Mich. App. 222 (1971) ..................................................................28

*Monongahela Navigation Co. v. United States*,
   148 U.S. 312 (1893)............................................................................25

*New York Electric Lines Co. v. Empire City Subway Co.*,
   235 U.S. 179 (1914)............................................................................26

*Nixon v. United States*,
   978 F.2d 1269 (D.C. Cir. 1992)..................................................... 2, 23

*Omnia Commercial Co. v. United States*,
   261 U.S. 502 (1923) ...................................................................... 24, 46

*Pa. Coal Co. v. Mahon*,
   260 U.S. 393 (1922)...................................................................... 45, 46

*Palazzolo v. Rhode Island*,
   533 U.S. 606 (2001)............................................................................31

*Palmyra Pac. Seafoods, L.L.C. v. United States*,
   561 F.3d 1361 (Fed. Cir. 2009) ..................................................... 47, 48

*Papasan v. Allain*,
   478 U.S. 265 (1986)..................................................................... passim

*Penn Central Transp. Co. v. City of New York*,
   438 U.S. 104 (1978).................................................................................5

*Petition of Vermont Elec. Power Producers, Inc.*,
   683 A.2d 716 (Vt. 1996)..........................................................................26

*Phillips v. Washington Legal Foundation*,
   524 U.S. 156 (1998)........................................................................... 2, 22

*Preseault v. United States*,
   100 F.3d 1525 (Fed. Cir. 1996) ....................................................... 29, 30

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986 (1984).................................................................................22

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974).................................................................................15

*Shelden v. United States*,
   7 F.3d 1022 (Fed. Cir. 1993) .......................................... 13, 36, 42, 48

*Sol-G Constr. Corp. v. United States*,
   231 Ct. Cl. 846 (1982) ............................................................................45

*St. Christopher Assocs., L.P. v. United States*,
   511 F.3d 1376 (Fed. Cir. 2008) ..............................................................45

*State v. Saugen*,
   169 N.W.2d 37 (Minn. 1969) ..................................................................28

*Stillings v. City of Winston-Salem*,
   306 S.E.2d 489 (N.C. 1983).....................................................................25

*Stillings v. City of Winston-Salem*,
   319 S.E.2d 233 (N.C. 1984).....................................................................25

*Sun Oil Co. v. United States*,
   215 Ct. Cl. 716 (1978) ............................................................................45

*T.O.F.C., Inc. v. United States,*
  683 F.2d 389 (Ct. Cl. 1982) ........................................................ 48, 49

*Tex. State Bank v. United States,*
  423 F.3d 1370 (Fed. Cir. 2005) ...................................................34

*United Nuclear Corp. v. United States,*
  912 F.2d 1432 (Fed. Cir. 1990) ............................................. 47, 48

*United States Trust Co. of N.Y. v. New Jersey,*
  431 U.S. 1 (1977) ..........................................................................23

*United States v. General Motors Corp.,*
  323 U.S. 373 (1945) ............................................................ 27, 28, 37

*United States v. Petty Motor Co.,*
  327 U.S. 372 (1946) ......................................................................23

*United States v. Puget Sound Power & Light Co.,*
  147 F.2d 953 (9th Cir. 1944) .......................................................26

*Yuba Gold Fields, Inc. v. United States,*
  723 F.2d 884 (Fed. Cir. 1983) .....................................................44

## Statutes and Rules

11 U.S.C. § 363 ....................................................................... passim

12 U.S.C. § 5201(1) ............................................................... 37, 43

12 U.S.C. § 5211 ............................................................ 11, 13, 37, 43

28 U.S.C. § 1491 ..........................................................................19

## Other Authorities

5B FED. PRAC. & PROC. CIV. § 1357 (3d ed.) ........................................................21

5C FED. PRAC. & PROC. CIV. § 1366 (3d ed.) ........................................................11

Financial Stability Oversight Board, FIRST QUARTERLY REPORT TO CONGRESS
PURSUANT TO SECTION 104(G) OF THE EMERGENCY ECONOMIC STABILIZATION
ACT OF 2008 (2008), *available at http://www.scribd.com/doc/11369943/Chief-
Compliance-Officer-for-Tarp* ................................................................................38

Mark J. Roe, David Skeel, *Assessing the Chrysler Bankruptcy*,
108 MICH. L. REV. 727 (2010) ..............................................................................44

President Obama: The White House: Office of the Press Secretary:
*Remarks by the President on the Auto Industry* (April 30, 2011), *available at*
http://www.whitehouse.gov/the_press_office/Remarks-by-the-President-on-the-
American-Automotive-Industry-3/30/09. ...............................................................39

Statement of Neil Barofsky, Special Inspector General to the Trouble Assets
Relief Program, before the Senate Committee on Finance (July 21, 2010),
*available at*
http://www.sigtarp.gov/Testimony/Testimony%20Before%20the%20Senate%20
Committee%20on%20Finance_7_21_2010%20Final.pdf. ....................................50

Steven Rattner, OVERHAUL:  AN INSIDER'S ACCOUNT OF THE OBAMA
ADMINISTRATION'S EMERGENCY RESCUE OF THE AUTO INDUSTRY (2010) ..........51

Steven Rattner, *The auto bailout: How we did it*, FORTUNE MAGAZINE,
(Nov. 23, 2009) *available at* http://money.cnn.com/2009/10/21/
autos/auto_bailout_ rattner.fortune. .......................................................................51

**Statement of Related Cases**

In accordance with Federal Circuit Rule 47.5, the Dealers' counsel are unaware of any other appeal in or from this action that has previously been before this or any other appellate court under the same or similar title. The Dealers' counsel are further aware of a companion case pending in this Court—*Colonial Chevrolet Co. v. United States*, No. 2013-5020—which may directly affect or be affected by a ruling in this case. The Dealers' counsel are also aware of one case pending in the United States Court of Federal Claims that may be directly affected by this Court's decision on appeal, *Spitzer Motor City, Inc. v. United States*, No. 12-900C.

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

_____

2013-5019

_____

Alley's of Kingsport, Inc., et al.,

Plaintiffs-Appellees,

v.

United States,

Defendant-Appellant.

_____

Appeal from the United States Court of Federal Claims in
Case No. 11-100C, Senior Judge Robert H. Hodges

_____

**BRIEF OF PLAINTIFFS-APPELLEES**

The Government's arguments in this appeal are not tethered to the

allegations in the actual complaint.  Instead of focusing on the allegations in the

complaint, the Government has instead created fictional or straw-man allegations,

which it then attacks.  And having discredited its straw-man allegations, the

Government then argues for reversing the trial court's order denying the

Government's motion to dismiss.  But when one reads the actual complaint,[1] one

sees that the allegations plainly state the elements of a compensable takings claim.

True, the trial court's decision does contain statements that suggest that in

the judge's mind the facts of this case seem unique.  But the trial judge also

correctly noted that takings jurisprudence, and its reliance on ad hoc, fact-based

inquiries, was designed to accommodate unique circumstances.  Indeed, the

instances in which governmental actions "go too far" and actually take private

property are rare.  And not surprisingly, therefore, a survey of the major takings

cases reveals that the entire body of takings jurisprudence is built on the back of

unique circumstances.[2]

The key point for this appeal is that the trial judge properly applied RCFC

12(b)(6), holding that the complaint alleged facts stating a legally cognizable

takings claim, which Plaintiffs-Appellees (collectively "the Dealers) are entitled to

pursue.  The trial court also properly concluded that the complaint alleged that the

Dealers possessed constitutionally protected property rights in their franchise

agreements and franchise dealerships, which had been taken by the federal

---

[1] The original complaint was filed on February 17, 2011 on behalf of 64 former dealers and was amended on three occasions to add 84 additional plaintiffs. *See* JA 1.

[2] *See, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) (installation of a cable on property); *Nixon v. United States*, 978 F.2d 1269 (D.C. Cir. 1992) (presidential papers); *Phillips v. Washington Legal Foundation*, 524 U.S. 156 (1998) (interest earned on IOLTA accounts).

government's actions under the federal Troubled Assets Relief Program.[3]

Likewise, the trial court properly rejected the Government's argument that these

takings claims are barred by collateral estoppel or res judicata by any rulings in the

bankruptcy proceeding.  The U.S. Court of Federal Claims, not the Bankruptcy

Court, as the trial court explained, has exclusive jurisdiction over takings claims

for money damages against the United States.[4]

 And as to the bankruptcy proceeding, the Government makes numerous

unsubstantiated factual assertions that are not in the complaint and are untrue.  The

Government contends, for instance, that Chrysler would have entered into

bankruptcy and sought to terminate 25% of its dealerships, even if the Government

had not required Chrysler to do so.[5]  But there is no truth to those statements.

There is no truth that Chrysler intended to go into bankruptcy and no truth that

Chrysler ever intended to simply terminate 25% of its dealerships.  Nor is there any

truth that the federal government simply chose to invest taxpayer dollars in

Chrysler—like any other private, commercial investor.  The complaint alleges—

and the evidence at trial will prove—that the federal government itself determined

that 25% of Chryslers' franchised dealerships should be terminated for the health

of Chrysler and of the American economy and selected a bankruptcy proceeding

---

[3] JA 4.
[4] JA 1–3.
[5] Def.'s Br. at 49–50.

(using a special procedure in bankruptcy) as a means to terminate the dealerships to avoid running afoul of state laws preventing the termination of franchised dealerships.[6]

In short, the Government offers a lot of arguments but none can withstand scrutiny. Consequently, this Court should affirm the trial court's denial of the Government's motion to dismiss.

## Statement of the Issues

### Rule 12(b)(6)

1.     To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'"[7] a standard that courts have described as minimal. Applying this standard, the trial court denied the Government's motion to dismiss this lawsuit. Should this Court affirm the trial court's denial of the Government's motion?

### Property rights issues

2.     The Government argues that the bankruptcy laws are a background principle that deprives the Dealers' of compensable property rights. But nothing in the bankruptcy laws insulates the government from takings liability if it chooses to use bankruptcy as a way of terminating 25% of Chryslers' franchised dealers in order to get around state laws that otherwise would not have allowed the cancellation of these franchised dealerships. Should this Court affirm the trial court's rulings?

### Takings issues

3.     The Supreme Court has repeatedly emphasized that "no 'set formula' exist[s] to determine, in all cases, whether compensation is constitutionally

---

[6] JA 79–82.

[7] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

due for a government restriction of property."[8]   The trial court therefore concluded that even if the facts of this case are unique, that alone was not a reason to dismiss the case.  Should this Court affirm the trial court's denial of the Government's motion to dismiss?

4.      The Dealers allege that the Government required that Chrysler terminate the Dealers' franchise agreements, destroying their dealership businesses, and forcing them to sell off their business inventories at fire-sale prices. The Dealers allege that this forced destruction of their property rights was done in order to benefit the American economy as a whole under the TARP program.  Should this Court affirm the trial court's denial of the Government's motion to dismiss?

**Collateral estoppel**

5.      The Government argues that the Bankruptcy Court decided the Dealers' takings claim and these claims are now barred by res judicata or collateral estoppel.  But the trial court rejected that argument, holding that the CFC has exclusive jurisdiction over takings claims for money damages against the United States—and that the Bankruptcy Court has no jurisdiction over takings claims.  Should this Court affirm the trial court's denial of the Government's motion to dismiss?

**STATEMENT OF THE CASE**

The Government's characterizations of the trial court's order denying its

motion to dismiss as "based upon atmospherics"[9] and "aura"[10] are unfair and read

the decision out of context.  The Government's assertion that "the court declined to

dismiss the complaint notwithstanding its acknowledgment that [the Dealers] did

---

[8] *Loretto*, 458 U.S. at 426 (*quoting Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).
[9] Def.'s Br. at 39.
[10] *Id.* at 11.

not state a plausible takings claim"[11] is also untrue; the trial judge's opinion contains no such statement.  But whatever weakness there may be in the trial court's explanation of its order, it is the Dealers' complaint and not the trial court's reasoning that is under review here.  The de novo standard applicable in this appeal allows this Court to make its own judgment about whether the complaint states a claim for relief regardless of how the trial judge might have interpreted the law or the facts alleged—making the trial court's reasoning practically irrelevant.

The Government also unfairly accuses the Dealers of wanting to use discovery to develop their claims.  The Dealers never made that argument to the trial court and they do not make it here.  The Dealers do not need discovery to develop their legal theory that (1) their franchises, businesses, showrooms, equipment and inventory were property protected under the Fifth Amendment, and (2) the Government's destruction of those property rights amounts to a taking for which the Fifth Amendment provides just compensation.  The Dealers' legal theory is drawn from the takings cases decided by this Court and the Supreme Court; it will not be sought nor found in the discovery process.

## STATEMENT OF THE FACTS

The Government's assertion that "[the Dealers do] not allege that the Government's actions diminished or destroyed the value of the plaintiffs'

---

[11] Def.'s Br. at 40.

dealerships"[12] is untrue.  The complaint certainly does allege that the

Government's actions terminated the Dealers' franchises and destroyed their

ongoing automobile dealerships:

- On February 17, 2009, as required by the Government, Chrysler submitted to the Auto Task Force its proposed restructuring plan.  The Chrysler Restructuring Plan did not call for the termination of Plaintiffs' dealer franchises or the filing of bankruptcy.[13]

- The Government rejected Chrysler's proposed restructuring plan and instead required that Chrysler "rationalize" its dealer network by terminating a substantial number of dealer franchises using Section 363 of the Bankruptcy Code.

- Therefore, on April 30, 2009, Chrysler and its affiliated companies filed a petition for bankruptcy in the District Court for the Southern District of New York.

- And on May 14, 2009, in compliance with the Government-announced restructuring plan, Chrysler moved the Bankruptcy Court for rejection (termination) of the franchise agreements it had with 789 Chrysler dealers including Plaintiffs—about 25% of all Chrysler dealer franchises—and on June 9, 2009, the U.S. Bankruptcy Court issued the Rejection Order, providing that rejected dealers "shall have no further rights (direct, indirect, contractual or otherwise) to act as an Authorized Dealer . . . ."

- By July 1, 2009, Plaintiffs had ceased doing business as franchised Chrysler dealers, having been deprived by the Government's actions of all contractual and statutory rights as Chrysler dealers.[14]

---

[12] Def.'s Br. at 47.

[13] JA 81.

[14] JA 82.

The Government flatly contradicts these allegations—properly done in the answer to complaint and not a motion to dismiss—when it puts forth its own allegations that

> (i) it was Chrysler's financial collapse that actually caused the dealerships to lose value, and (ii) had the United States not invested in Chrysler, AOKI's dealerships would have had the same value they now possess.[15]

The Government does not identify a specific event or date (and certainly no allegation in the complaint) supporting its affirmative allegation that "it was Chrysler's financial collapse that actually caused the dealerships to lose value."[16] But that factual assertion, which flatly contradicts the complaint, has no place in a motion to dismiss where the court is "bound for the purposes of this review to take the well-pleaded factual allegations in the complaint as true."[17]  Read in the light most favorable to the Dealers (as the Court must),[18] the complaint alleges that the Dealers' franchises were destroyed by the Bankruptcy Court's June 9, 2009 order "that rejected dealers 'shall have no further rights (direct, indirect, contractual or otherwise) to act as an Authorized Dealer . . . .'"[19]

---

[15] Def.'s Br. at 48.

[16] *Id.*

[17] *Papasan v. Allain*, 478 U.S. 265, 283 (1986); *see also Anaheim Gardens v. United States*, 444 F.3d 1309, 1314–1315 (Fed. Cir. 2006).

[18] *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (*citing Papasan*, 478 U.S. at 283; *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).

[19] JA 82.

The Dealers' franchises had substantial value in late 2008 when Congress enacted and funded the TARP program.[20] Using this authority the President and Secretary of the Treasury, set up the Auto Industry Financing program to save the auto industry—including Chrysler.  The Dealers' franchises retained value when on February 17, 2009, Chrysler submitted its viability plan to the Government proposing to retain all existing dealers.[21]  The Government may wish to contest these factual allegations at trial, but it cannot contest them in a motion to dismiss.

Similarly, nothing in the complaint and nothing the Government cites supports its affirmative allegation that "had the United States not invested in Chrysler, AOKI's dealerships would have had the same value they now possess."[22] The Government's allegation is illogical.  According to the Government, sometime in 2008, all Chrysler dealerships became valueless and either remained so to the present day or somehow regained value through some unspecified event.  Far more plausible is the Dealers' allegation that it was the Government's requirement that Chrysler terminate 25% of its dealers that caused those dealerships to lose all value while the rest did not.

Finally, the Government affirmatively alleges that without this taking "the plaintiffs would have had exactly what they ultimately obtained: a claim against a

---

[20] JA 79–81.
[21] JA 81.
[22] Def.'s Br. at 48.

9

bankrupt company."[23]   Nothing in the complaint supports the Government's

allegation.  What the complaint alleges is that Congress adopted and funded a

program to save Chrysler jobs, an economic contribution for a public purpose and,

in carrying out this program, decided that 25% of Chrysler's dealerships must be

terminated to achieve economic stability in the country.  The Government's forced

sacrifice of these dealerships constitutes the takings alleged in the Dealers'

complaint.

## SUMMARY OF THE ARGUMENT

The trial court properly denied the Government's motion to dismiss the

complaint under RCFC 12(b)(6).  The complaint adequately alleges that the

Dealers' franchises (including their contracts, businesses, showrooms, stock and

equipment) are property within the meaning of the Fifth Amendment and that the

Government's requirement that Chrysler terminate those franchises was

government action amounting to a taking for which just compensation is due.  This

is all RCFC 8 requires to state a claim for relief:  "[A] short and plain statement of

the claim showing that the pleader is entitled to relief."

"In ruling on a 12(b)(6) motion to dismiss, the court must accept as true the

complaint's undisputed factual allegations and should construe them in a light most

---

[23] Def.'s Br. at 49.

favorable to the plaintiff."[24]  But here the Government all but ignores the allegations of the Dealers' complaint, setting up its alternative version of the facts and then arguing that this alternative fact statement—often the opposite of the complaint's allegations—fails to state a claim for relief.  For example, the complaint alleges that the United States "required that Chrysler 'rationalize' its dealer network by terminating a substantial number of dealer franchises using Section 363 of the Bankruptcy Code,"[25] while the Government alleges just the opposite: "Chrysler – acting within its own discretion – rejected AOKI's dealership agreements during the bankruptcy proceedings" so "the Government cannot owe compensation to the plaintiffs under the Fifth Amendment."[26]  Because a motion to dismiss must be decided only on the well-pleaded allegations of the complaint,[27] the Government's affirmative assertions contradicting the complaint's allegations must be disregarded.

Nor may the Government rely on the decisions of the Bankruptcy Court or the Second Circuit to contradict the complaint's allegations.  The Bankruptcy Court had no jurisdiction to decide this Tucker Act takings case.[28]  In addition, the

---

[24] *Cambridge*, 558 F.3d at 1335 (Fed. Cir. 2009).

[25] JA 82.

[26] Def.'s Br. at 29.

[27] *Am. Contractors Indem. Co. v. United States*, 570 F.3d 1373, 1376 (Fed. Cir. 2009) (*citing* 5C FED. PRAC. & PROC. CIV. § 1366 (3d ed.)).

[28] *McGuire v. United States*, 707 F.3d 1351 (Fed. Cir. 2013).

Supreme Court has since vacated the Second Circuit's opinion.[29]  Finally, in any

event the issues of fact and standard of proof in the Bankruptcy Court were very

different from those applicable in this case.  The Bankruptcy Court's order states:

> None of the evidence provided by the Debtors, Affected Dealers or
> any other party in interest that was admitted into evidence in
> connection with the Motion, the Objections, the Hearing and this
> Order shall be treated as res judicata or collateral estoppel as to the
> Debtors, their estates, Affected Dealers or any other party in interest,
> nor shall any such evidence have preclusive effect on the Debtors,
> their estates, Affected Dealers or any other party in interest in
> connection with any other proceeding, including in connection with
> the assertion of Rejection Damage Claims or other claims, rights or
> remedies by an Affected Dealer. All such evidence, to the extent
> admitted, was admitted for the purposes of the Hearing to
> consider the Motion.[30]

In addition, RCFC 15(a) allows amendment of a complaint, for which "[t]he

court should freely give leave when justice so requires."[31] Should this Court

conclude that the Dealers' complaint requires additional allegations, the case

should be remanded with instructions to allow the Dealers to amend.

The Dealers' complaint alleges the two elements of a takings claim:

> First, as a threshold matter, the court must determine whether the
> claimant has established a property interest for purposes of the Fifth
> Amendment. . . . Second, after having identified a valid property
> interest, the court must determine whether the governmental action at

---

[29] *Ind. State Police Pension Trust v. Chrysler, LLC*, 556 U.S. 960 (2009).

[30] *In re Chrysler, LLC*, No. 09-50002, Rejection Order, Doc. No. 3802 (June 9,
2009), JA264.

[31] RCFC 15(a)(2).

issue amounted to a compensable taking of that property interest.[32]

The Dealers explicitly allege that they possess constitutionally protected property rights in their franchises, which includes their franchise agreements, their franchise businesses, and all the inventory, buildings, and real property rights associated with those franchises.[33]  And second, they allege Governmental action, taken under the authority of TARP[34] and the Automobile Industry Financing Program, that restructured Chrysler and, in the process, required Chrysler to terminate 25% of its dealerships—which Chrysler did not want to do.  Having alleged a brief, plain statement of both elements of a takings claim, the Dealers have stated a claim for relief.[35]

That the Government chose a proceeding that used the Bankruptcy Court to terminate the Dealers' franchises does not trump the Dealers' Fifth Amendment right to just compensation.  In *Shelden v. United States*,[36] this Court found a taking where the Government's use of the judicial asset forfeiture process caused a taking. Likewise, in *Boise Cascade Corporation v. United States*[37] this Court recognized that a district court order could result in a taking.  Similarly, the Government's

---

[32] *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004) (citations omitted).

[33] JA 77–78.

[34] 12 U.S.C. § 5211(a)(1).

[35] RCFC 8(a).

[36] *Shelden v. United States*, 7 F.3d 1022 (Fed. Cir. 1993) (*abrogation on other grounds recognized at* 682 F.3d 1364).

[37] *Boise Cascade Corp. v. United States*, 296 F.3d 1339 (Fed. Cir. 2002).

exercise of a contract right to take title to an unfinished ship[38] and a power requisition agreement to cut off a sawmill's water[39] were recognized as unconstitutional takings.

Here, too, the Government, acting in this case to help stabilize a crippled economy, was acting for a public purpose: "Clearly, there is no basis for exempting economic development from our traditionally broad understanding of public purpose."[40]

Accordingly, the trial court's denial of the Government's motion to dismiss should be affirmed.

## ARGUMENT

### I.     The Government's arguments in this appeal conflict with the Rule 12(b)(6) standards established by this Court and the Supreme Court

The Supreme Court has held that the role of a federal court in determining the sufficiency of a complaint under Rule 12(b)(6) is necessarily the limited one of determining if the plaintiff is entitled to offer evidence in support of the claim— even if the likelihood of prevailing is remote:

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the

---

[38] *Armstrong v. United States*, 364 U.S. 40 (1960).
[39] *Int'l Paper Co. v. United States*, 282 U.S. 399 (1931).
[40] *Kelo v. City of New London*, 545 U.S. 469, 484 (2005).

14

pleadings that a recovery is very remote and unlikely but that is not the test. Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.[41]

Applying this principle in *Bell Atlantic Corporation v. Twombly*,[42] the Supreme Court held that to state a claim for agreement to fix prices in violation of the Sherman Antitrust Act, the complaint must state sufficient facts—which must be taken as true for purposes of the motion to dismiss—to suggest that such an agreement existed:

> [W]e hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.[43]

In *Ashcroft v. Iqbal*,[44] the Supreme Court clarified that a plaintiff does not need to allege facts to show that its claim is probable; rather, all that is required to survive a motion to dismiss is that the claim is plausible:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.,* at 570, 127 S.Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for

---

[41] *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *see also Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 938 (Fed. Cir. 2007).
[42] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).
[43] *Id.* at 556.
[44] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

the misconduct alleged.  *Id.,* at 556, 127 S.Ct. 1955.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.[45]

As this Court has stated, "[a] dismissal for failure to state a claim . . . is a decision on the merits which focuses on whether the complaint contains allegations that, if proven, are sufficient to entitle a party to relief."[46]  This means that in deciding a motion to dismiss under Rule 12(b)(6), the trial court must still "accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff."[47]

### A.    The Government improperly fails to take the allegations of the complaint as true

As the Supreme Court has stated, in reviewing the sufficiency of a complaint under Rule 12(b)(6), "[w]e are bound for the purposes of this review to take the well-pleaded factual allegations in the complaint as true."[48]  Similarly, this Court has stated:  "In ruling on a 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light

---

[45] *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 556, 570).

[46] *Gould, Inc.*, 67 F.3d at 929 (Fed. Cir. 1995) (internal citations omitted).

[47] *Cambridge*, 558 F.3d at 1335 (*citing Papasan*, 478 U.S. at 283; *Gould, Inc.*, 935 F.2d at 1274).

[48] *Papasan*, 478 U.S. at 283; *see also Anaheim Gardens*, 444 F.3d at 1314–1315 (*quoting Gould, Inc.*, 935 F.2d at 1274 ("[I]n reviewing a dismissal for failure to state a claim, we must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant.")).

most favorable to the plaintiff."[49]

But here, in arguing for dismissal of this lawsuit, the Government all but ignores the allegations of the Dealers' complaint, setting up its alternative version of the facts and then arguing that these straw-man alternative fact statements— often the opposite of the complaint's allegations—fail to state a claim for relief. Although the complaint in this case alleges, for instance, that the United States "required that Chrysler 'rationalize' its dealer network by terminating a substantial number of dealer franchises using Section 363 of the Bankruptcy Code,"[50] the Government's brief argues that "[i]n bankruptcy, New Chrysler chose not to assume plaintiffs' dealership agreements."[51] Or the Government argues that "Chrysler – acting within its own discretion – rejected AOKI's dealership agreements during the bankruptcy proceedings."[52]

The Government also puts words in the Dealers' mouths often in direct conflict with the true allegations in the Dealers' complaint and without support in the record. Fictional or straw-man allegations have no place in a Rule 12(b)(6) review of the sufficiency of the complaint and therefore cannot support reversing the trial court's ruling in this case. Where factual disputes such as these exist, they

---

[49] *Cambridge*, 558 F.3d at 1335 (citing *Papasan*, 478 U.S. at 283; *Gould, Inc.*, 935 F.2d at 1274).
[50] JA 82.
[51] Def.'s Br. at 7.
[52] Def.'s Br. at 29.

must be resolved at trial and not in a motion to dismiss.[53]

The Government's brief is replete with numerous allegations, all of which are simply made up out of whole cloth and actually do not appear anywhere in the Dealers' complaint.[54]  Likewise, the Government asserts facts that are not in the record—and which the Dealers contend will be proven to be untrue at trial.  These untrue allegations also do not appear in the Dealers' complaint[55] and so cannot be considered in a motion that tests the sufficiency of that complaint.

### B.    The opinion of the Bankruptcy Court cannot supply new facts on which to base the Government's motion to dismiss

The Government mischaracterizes and then relies on the decision of the Bankruptcy Court, and then asserts that "[c]ollateral estoppel bars [the Dealers'] claim that Government action resulted in a taking of dealers' property."[56]  But the Government may not use the Bankruptcy Court's decision to supply facts that contradict the complaint in this case.

First, the Bankruptcy Court and the Second Circuit had no jurisdiction to decide the takings claims asserted in the Dealers' complaint—claims that lie within the exclusive jurisdiction of the U.S. Court of Federal Claims under the Tucker

---

[53] *See, e.g., Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993).

[54] *See, e.g.*, Def.'s Br. at 2, 20, 25, 27, 29.

[55] *See, e.g., id.* at 48, 49.

[56] Def.'s Br. at 35.

Act.[57]  Directly on point, this Court recently held in *McGuire v. United States*[58] that the ripeness determination of the Ninth Circuit, in an appeal from the Bankruptcy Court and a federal district court, was not law of the case because the Bankruptcy Court lacked jurisdiction to hear the takings claim.[59]  Consequently, the trial court and this Court were not bound by the Ninth Circuit's decision:  "We conclude that we are not bound by the Ninth Circuit's ripeness decision because the Ninth Circuit lacked authority to decide the question."[60]

The Court of Claims, in a governmental employment case, reached a similar conclusion, stating:  "[A] court vested with exclusive jurisdiction to decide an issue is not precluded from deciding it, although it had been previously decided by another court as an incidental fact necessary to be determined in order to decide an issue within its jurisdiction."[61]

Second, the Bankruptcy Court itself stated in the Chrysler proceedings that it did not intend its decision to have collateral estoppel or res judicata effect.[62]

Third, the Second Circuit's opinion affirming the Chrysler bankruptcy has no precedential effect.  On December 14, 2010 the Supreme Court issued an order

---

[57] 28 U.S.C. § 1491.

[58] *McGuire*, 707 F.3d 1351 (Fed. Cir. 2013).

[59] *Id.* at 1357–1358.

[60] *Id.* at 1357.

[61] *Edgar v. United States*, 145 Ct. Cl. 9, 14 (1959).

[62] *In re Chrysler, LLC*, No. 09-50002, Rejection Order, Doc. No. 3802 (June 9, 2009), JA264.

stating: "Judgment vacated, and case remanded to the United States Court of Appeals for the Second Circuit with instructions to dismiss the appeal as moot."[63]

Fourth, the Bankruptcy Court's decision also does not create issue preclusion, which requires that "both the facts and the legal standard used to assess [an issue] are the same in both proceedings."[64]  In *Copeland v. Merrill Lynch & Company*, the Fifth Circuit held that a creditor was not collaterally estopped from re-litigating a reorganization agreement submitted during bankruptcy because "[b]oth the factual issue and legal analysis required in the . . . bankruptcy confirmation hearing differed from the issue presented by . . . [the] individual breach of contract claim."[65]  The Chrysler bankruptcy (completed in forty-two days) did not apply the same standards the Court of Federal Claims would use to try a takings case, nor is the technical issue of "control" under the bankruptcy law determinative of any issue in a takings case:

> Thus, the Governmental Entities, as lenders, are neither controlling the Debtors nor New Chrysler and, therefore, are not on both sides of the Sale Transaction before the Court.  There is no fraud or collusion and the Governmental Entities have authority to enter into this transaction.[66]

---

[63] *Ind. State Police Pension Trust v. Chrysler, LLC*, 556 U.S. 960 (2009).

[64] *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir. 1995).

[65] *Id.*

[66] *In re Chrysler LLC*, 405 B.R. 84, 108 (S.D.N.Y. 2009).

**C.      Should this Court find the complaint deficient, it should direct the
trial court to allow the Dealers to amend to cure that deficiency**

RCFC 15(a) provides that once a responsive pleading or a motion to dismiss
has been filed, a plaintiff may amend the complaint with leave of the court and
"[t]he court should freely give leave when justice so requires."[67]

In *Foman v. Davis*,[68] the Supreme Court reversed the denial of a plaintiff's
motion to amend a complaint after the trial court found that it had failed to state a
claim, explaining that cases should be decided on the merits, not mere
technicalities in pleadings.[69]

Commentators Wright and Miller similarly state that "leave to amend the
complaint should be refused only if it appears to a certainty that the plaintiff cannot
state a claim."[70]

In *Ashcroft v. Iqbal*,[71] having held that the complaint failed to state a claim
for relief, the Supreme Court then remanded the case back with instructions that
"[t]he Court of Appeals should decide in the first instance whether to remand to the
District Court so that respondent can seek leave to amend his deficient

---

[67] RCFC 15(a)(2).

[68] *Foman v. Davis*, 371 U.S. 178 (1962).

[69] *Id.* at 181–182.

[70] CHARLES ALAN WRIGHT, ET AL., 5B FED. PRAC. & PROC. CIV. § 1357 (3d ed.)
(footnotes omitted).

[71] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

complaint."[72]  Should this Court conclude that the Dealers' complaint is deficient, it should remand to the trial court with instructions to allow the Dealers to amend their complaint to cure those deficiencies.

## II.    The Dealers have alleged that they possessed constitutionally protected property rights in their franchises

The Dealers' amended complaint plainly states a claim for relief under the just compensation clause of the Fifth Amendment.  As this Court held in *American Pelagic Fishing Company v. United States*,[73] there are two elements to a takings claim:  The existence of a property interest and governmental action which took that interest.[74]

Here, the Dealers explicitly allege that they possess constitutionally protected property rights in their franchises, which included their franchise agreements, their franchise businesses, and all the inventory, buildings, and real property rights associated with those franchises.

In determining what is property, courts generally look to state law.[75]  But under the laws of every state, property has been historically and consistently described to encompass a broad array of "mutually reinforcing understandings that

---

[72] *Iqbal*, 556 U.S. at 687.

[73] *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363 (2004).

[74] *Id.* at 1372.

[75] *E.g.*, *Ark. Game & Fish Comm'n*, 133 S. Ct. at 522; *Phillips v. Washington Legal Found.*, 524 U.S. at 163–164; *Ruckelshaus v. Monsanto Co.*, 467 U.S. at 1001.

are sufficiently well grounded to support a claim of entitlement."[76]

The Solicitor General of the United States, in a recent brief filed in a case pending before the Supreme Court, stated that "[t]he [Supreme] Court has, in a variety of contexts, declared an array of intangible interests to be property."[77]  That brief further states that property includes business property and the intangible "right to acquire property by honest labor or the conduct of a lawful business."[78]

This universally recognized broad definition of property fully encompasses the franchises of these Dealers.

## A.    Franchise agreements (contracts) are property

This Court, citing Supreme Court precedent, has held that contracts are property protected by the Fifth Amendment:

> [T]here is also ample precedent for acknowledging a property interest in contract rights under the Fifth Amendment.  *See, e.g., Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation.    Valid contracts are property, whether the    obligor be    a private individual, a municipality, a State or the United States.");    *United States v. Petty Motor Co.,* 327 U.S. 372, 381, 66 S.Ct. 596, 90 L.Ed. 729 (1946) (holding that plaintiff was entitled to just compensation for government's taking of option to renew a lease); *United States Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 19 n. 16, 97 S.Ct. 1505, 52

---

[76]  *Nixon v. United States*, 978 F.2d 1269, 1276 (D.C. Cir. 1992) (*citing Kaiser Aetna v. United States*, 444 U.S. 164, 179 (1979) (property consists of recognized expectancies)).

[77] Br. for the United States at 18, *Sekhar v. United States*, No. 12-357 (S.Ct. Mar. 27, 2013) (arguing that legal advice constitutes property).

[78] *Id.* (*citing Int'l News Serv. v. Associated Press*, 248 U.S. 215, 236 (1918)).

L.Ed.2d 92 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid.").[79]

As a contract, a franchise agreement is itself property protected by the Fifth Amendment. In *Long Island Water Supply Company v. Brooklyn*, the Supreme Court held that "a contract is property, and like any other property, may be taken under condemnation proceedings for public use. Its condemnation is of course subject to the rule of just compensation."[80] The *Long Island Water Supply* court further held that "[a] franchise is property. . . . It is incorporeal property. . . ."[81] And the Supreme Court in *Omnia Commercial Company v. United States*[82] specifically noted that franchises are property:

> In the Monongahela Case the property which was taken was a lock and dam, built by the company, pursuant to the invitation of the United States and the state of Pennsylvania, the latter, in consideration, giving the company a franchise to exact tolls. The franchise, therefore, was not merely a contract in respect of the property taken, but was an integral part of it, and this court (148 U. S. 329, 13 Sup. Ct. 627, 37 L. Ed. 463) said:
>
>> 'So, before this property can be taken away from its owners, the whole value must be paid; and that value depends largely upon the productiveness of the property, the franchise to take tolls.'[83]

Every state, including the states where these Dealers were in business until

---

[79] *Cienega Gardens v. United States*, 331 F.3d 1319, 1329–1330 (Fed. Cir. 2003).
[80] *Long Island Water-Supply Co. v. City of Brooklyn*, 166 U.S. 685, 690 (1897).
[81] *Id.* at 693.
[82] *Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923).
[83] *Id.* at 513 (*quoting Monongahela Navigation Co. v. United States*, 148 U.S. 312, 329 (1893)).

terminated, considers franchise agreements to be property. For instance, a federal

court applying California law held that

> [a] franchise is considered a possessory "estate in real property"
> similar to a leasehold or an easement, and an "incorporeal
> hereditament." . . . [P]rovided that the franchisee performs the
> covenants in the contract, the rights acquired by the franchise
> constitute "vested property rights" protected by both the Constitutions
> of this State and the United States of America. These rights cannot be
> taken away or impaired by the State, even though the legislature
> should modify or repeal the enabling legislation, or by the people
> through a constitutional amendment.[84]

Under North Carolina law,

> [a] franchise is property in all respects necessary for its protection
> under the Constitutions of the United States and North Carolina. The
> owner of a franchise or a person claiming rights thereunder has the
> same expectations for the protection of his interest as has the owner of
> any other property. Accordingly, the same remedies are available to
> him when his interest is impaired by governmental action.[85]

In Vermont, "[a] grant of franchise conveys a property interest that is subject to

due process protections."[86] And according to the Ninth Circuit, applying

Washington state law,

> [t]he Washington cases hold that the property in a franchise is one
> which may be either taken or damaged. While in some of these
> compensation is made for damaging the property in a street railway or
> power transmission line franchise, all hold the franchise confers a

---

[84] *In re S. Bay Expressway, L.P.*, 434 B.R. 589, 599 (Bankr. S.D. Cal. 2010)
(citations omitted) (applying California law).
[85] *Stillings v. City of Winston-Salem*, 306 S.E.2d 489, 492 (N.C. 1983), *rev'd on
unrelated grounds*, 319 S.E.2d 233 (N.C. 1984).
[86] *Petition of Vermont Elec. Power Producers, Inc.*, 683 A.2d 716, 720 (Vt. 1996).

private right of property which may be damaged or taken from its owner.[87]

The District Court for the District of New Jersey recognized that there would be no question that franchises are property protected by the Fifth Amendment,[88] and the Eastern District of Virginia likewise held that a franchise would be protected property under the Fifth Amendment.[89]  The Western District of Michigan reached the same conclusion: "[F]ranchises are considered property for purposes of the takings clause . . . ."[90]

### B.    The Dealers' franchise business and vehicle inventory, service equipment, buildings, and other assets are also property

There is also no question that the Dealers' franchise businesses and business property—which were taken by federal action—are also property protected by the Fifth Amendment.  The cases so holding form the bedrock of black letter takings law.  In *Kimball Laundry Company v. United States*,[91] the Supreme Court held that the government was liable for the temporary taking of the plaintiff's business during World War II—including the company's land, plant, equipment, and its

---

[87] *United States v. Puget Sound Power & Light Co.*, 147 F.2d 953, 955 (9th Cir. 1944) (applying Washington law).

[88] *Heir v. Del. River Port Auth.*, 218 F. Supp. 2d 627 (D.N.J. 2002).

[89] *Bajwa v. Sunoco, Inc.*, 320 F. Supp. 2d 454, 461 (E.D. Va. 2004).

[90] *Carlson v. Vill. of Union City, Mich.*, 601 F. Supp. 801, 813–814 (W.D. Mich. 1985) (*citing New York Electric Lines Co. v. Empire City Subway Co.,* 235 U.S. 179, 193–94 (1914); *Lansing Township v. City of Lansing*, 97 N.W.2d 128, 133 (Mich. 1959)).

[91] *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949).

intangible trade routes.[92]  By trade routes, the Court explained that it meant "both .

. . the lists of customers built up by solicitation over the years and . . . the

continued hold of the Laundry upon their patronage."[93]  In short, the trade routes

constituted the value of its business.[94]

The *Kimball Laundry* court also concluded that the business itself was

property that had been taken:

> [A]n exercise of the power of eminent domain which has the
> inevitable effect of depriving the owner of the going-concern value of
> his business is a compensable 'taking' of property.[95]

The Supreme Court in *United States v. General Motors Corporation*,[96] also

held that the Government's use and occupation of a warehouse, which housed

General Motors' fixtures and permanent equipment, was a taking.  Although the

United States argued that it should not have to pay for the taking of these fixtures

and equipment over and above the value of the lease payments for the warehouse,

the Supreme Court disagreed:

> For fixtures and permanent equipment destroyed or depreciated in
> value by the taking, the respondent is entitled to compensation.  An
> owner's rights in these are no less property within the meaning of the
> Fifth Amendment than his rights in land and the structures thereon
> erected. . . . [A]nd since they are property distinct from the right of
> occupancy such compensation should be awarded not as part of but in

---

[92]  *Kimball Laundry Co.*, 338 U.S. at 3–6.

[93] *Id.* at 8.

[94] *Id.* at 10–11.

[95] *Id.* at 13.

[96] *United States v. General Motors Corp.*, 323 U.S. 373 (1945).

addition to the value of the occupancy as such.[97]

State courts too consider businesses and business property compensable interests for purposes of the just compensation clause.  In *Michigan State Highway Commissioner v. L&L Concessions*,[98] the Michigan Court of Appeals considered as compensable property a racetrack concession stand business which was destroyed by a government condemnation of the racetrack.[99]  The Supreme Court of Minnesota in *State v. Saugen*,[100] held that the owner of a liquor license was entitled to recover the going concern value of his business.[101]

Here, as the amended complaint alleges, the Dealers owned dealerships, in which they made substantial investments to construct showrooms and shop facilities, purchase and finance inventory, train and employ sales, service and accounting staff, purchase parts and repair equipment, and advertise the dealership.[102]

C.    **There is nothing in the bankruptcy statute that negates the conclusion that the Dealers' franchise agreements or businesses are compensable property rights**

The Government makes the specious argument that general federal

---

[97] *General Motors Corp.*, 323 U.S. at 383–384.

[98] *Mich. State Highway Comm'n v. L&L Concession Co.*, 31 Mich. App. 222 (1971).

[99] *L&L Concession Co.*, 31 Mich. App. at 232–233.

[100] *State v. Saugen*, 169 N.W.2d 37 (Minn. 1969).

[101] *Id.* at 45–46.

[102] JA 77–78.

legislation providing for the governance of bankruptcy operates as a background

principle to deprive the Dealers of a compensable property right.  But this Court,

sitting en banc, has already rejected that background principles argument.[103]

> In *Preseault*, the Government, as it does here, invoked

> the broad concept that "background principles" define property rights, suggesting that there is nothing to preclude the use of federal law as well as state law in selecting the relevant "background principles." In support of this broad principle the Government relies heavily on phrases extracted from the Supreme Court's recent decision in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).[104]

> Flatly rejecting the Government's *Lucas* background principles argument,

the *Preseault* Court stated

> *Lucas* provides no such support.  The background principles referred to by the Court in *Lucas* were state-defined nuisance rules.  *Id.* at 1029-32, 112 S.Ct. at 2900-02.  In *Lucas* the Court took the position that if the State of South Carolina wished to control what it considered undesirable conduct by property owners (in that case building a house on beachfront property), a regulatory agency's order preventing the conduct was non-compensable under the Fifth Amendment if the imposition did little more than echo similar constraints available under the State's traditional nuisance law.  In other words, the State could impose non-compensable restraints on property owners either through court-ordered injunctions or administrative agency orders, so long as either were within the scope of established state law principles of common law nuisance, principles which inhere in every property owner's title.  *Id.*

> Nothing in *Lucas* suggests that the background principles of a state's property law include the sweep of a century of federal regulatory

---

[103] *Preseault v. United States*, 100 F.3d 1525, 1530 (Fed. Cir. 1996).
[104] *Id.* at 1538.

legislation, and indeed much of what the Supreme Court said then, as well as in *Preseault II,* about property rights indicates to the contrary. Nor is there any suggestion in this case that the Preseaults' use of their property could be considered in any way to be a public nuisance under traditional nuisance concepts, justifying the intervention of state authorities.[105]

This Court in *Preseault* also distinguished the same two cases on which the

Government relies here:

> The Government cites two recent cases by this court, *M & J Coal Co. v. United States*, and *California Housing Securities, Inc. v. United States*, as evidence that federal regulatory law generally modifies state property rights, and renders conflicting state-created property rights unenforceable and noncompensable. In *M & J Coal* we held that the Government, in enforcing the provisions of the Surface Mining Control and Reclamation Act of 1977, could require a coal mine operator to mine in a manner that prevented surface subsidence, and thus prevent harm to the interests of third parties. We rejected the companies' contention that enforcement of these safety standards took their property in violation of the Fifth Amendment. In *California Housing,* we upheld the right of federal bank regulators, in the course of enforcing the federal regulatory framework governing the banking industry, to seize the books and papers and occupy the premises of a bank that was subject to an enforcement action.

> In both cases what was at issue was the reasonableness of the Government's actions in enforcing the law. Since no one has a property right to violate otherwise valid laws controlling social conduct, the claims that enforcement of the law, found to have been conducted reasonably under the circumstances, constituted a taking under the Fifth Amendment were unavailing. In the Preseaults' case, the occupation of their property by the Government was not in pursuance of an enforcement action to correct prohibited conduct on their part, unless it can be said that their desire to enjoy their private property without sharing it with the public falls under that rubric.[106]

---

[105] *Preseault*, 100 F.3d at 1538–1539.

[106] *Id.* at 1539 (internal citations omitted).

In *Palazzolo v. Rhode Island*,[107] the Supreme Court also rejected a similar argument that the existing statutory scheme extinguished property rights protection simply by destroying any expectation of just compensation.  The Supreme Court explained that holding that any existing law would negate all future takings would result in the state being able to put "an expiration date" on the just compensation clause, or as the Court put it:  "The State may not put so potent a Hobbesian stick into the Lockean bundle."[108]

The Government also cites to this Court's decision in *American Pelagic*[109] as support for its failed argument, but *American Pelagic* merely establishes that when a statute creates rights, an amendment to that statute may also take rights away—especially when those rights are permits or licenses.  In *American Pelagic*, this Court addressed the issue of whether the right to fish for Atlantic mackerel and herring in the Exclusive Economic Zone is a legally cognizable property interest such that "it was a stick in the bundle of property rights" belonging to the plaintiff fishing company.[110]  The Court concluded that the answer was no, because the Magnuson Act, under which fishing rights were acquired and controlled, did not

---

[107] *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001).
[108] *Id.* at 627.
[109] *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363 (Fed. Cir. 2004).
[110] *Id.* at 1376.

"vest in their owners a property right protected by the Fifth Amendment."[111]

*Bair v. United States*[112] and the related cases involving Government-held liens have no relation to this case. The Government was not exercising a lien or any other property right when it required Chrysler to terminate 25% of its dealerships.

Here, the Dealers' possess vested property rights under the laws of the states in which they once did business.[113] Their property rights were not acquired or altered by any federal bankruptcy statute. Here, too, there is nothing in the Bankruptcy Code that makes unlawful the Dealers' businesses of selling and servicing motor vehicles. The notion that the bankruptcy statute is a background principle that takes away a stick in the bundle of the Dealers' property rights—as erroneously argued by the Government—therefore cannot be sustained. And so, regardless of whether the bankruptcy statutes may have been enacted before the Dealers acquired their property rights—which may or may not be factually true since there are no allegations about this issue in the Dealers' complaint—that fact is irrelevant to this case.

As the Supreme Court held in *Louisville Joint Stock Land Bank v. Radford*, "[t]he bankruptcy power, like the other great substantive powers of Congress, is

---

[111] *Am. Pelagic Fishing Co.*, 379 F.3d at 1379 (*citing Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir. 1998)).
[112] *Bair v. United States*, 515 F.3d 1323 (Fed. Cir. 2008).
[113] JA 19–76.

subject to the Fifth Amendment."[114]

Finally, and most importantly, the Dealers do not allege that the termination of their franchise agreements and dealerships occurred in a normal bankruptcy proceeding. To the contrary, they allege that the federal government forced Chrysler into Bankruptcy Court because the Government had identified a special procedure to terminate the franchises as a means of getting around state laws protecting the franchises.[115] To say that any background principles of property law shield the Government from takings liability in this context renders the notion of background principles meaningless. In short, there is no basis whatsoever for the Government's specious argument that the Dealers' property rights are limited or negated by the Bankruptcy Code.

## III. The Dealers' complaint alleges governmental action constituting a Fifth Amendment taking

The complaint also alleges the second element of a takings case: Governmental action for a public purpose that took the Dealers' property rights.[116] The Government in fact seems to admit that if, as the Dealers' complaint alleges, the United States required Chrysler to use Section 363 of the Bankruptcy Code to terminate the Dealers' franchises, it would constitute a taking: "If the Government, however, commands an action by a third party that would constitute a

---

[114] *Louisville Jt. Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935).
[115] JA 82.
[116] *Am. Pelagic Fishing Co.*, 379 F.3d at 1372.

taking if undertaken directly by the Government, a Fifth Amendment taking may also occur. *Tex. State Bank v. United States,* 423 F.3d 1370, 1376-77 (Fed. Cir. 2005)."[117]  Since that is exactly what the complaint alleges, it states a takings claim.

Instead of discussing the complaint's allegations, however, the Government's brief mischaracterizes the complaint's allegations and the trial court's opinion, and then asks this Court to dismiss the complaint as the Government has re-characterized it—all while ignoring the real allegations of the complaint that the Dealers actually filed in this case.[118]  For instance, despite the Government's contentions to the contrary, the Dealers do not assert "taking claims based on the Government's conditional financing offers extended to Chrysler in the course of bankruptcy proceedings."[119]  The complaint does not even mention conditional financing offers, nor does it state that the Government extended conditional financing offers to Chrysler in bankruptcy.

Nor is it true that the Dealers contend "that these conditional financing offers caused Chrysler to reject [their] dealerships."[120]  Instead, the amended complaint alleges:

164.   On February 17, 2009, as required by the Government, Chrysler

---

[117] Def.'s Br. at 30.
[118] *See* JA 19.
[119] Def.'s Br. at 9.
[120] *Id.* at 20.

submitted to the Auto Task Force its proposed restructuring plan. The Chrysler Restructuring Plan did not call for the termination of Plaintiffs' dealer franchises or the filing of bankruptcy.

. . .

166. The Government rejected Chrysler's proposed restructuring plan and instead required that Chrysler "rationalize" its dealer network by terminating a substantial number of dealer franchises using Section 363 of the Bankruptcy Code.

167. Therefore, on April 30, 2009, Chrysler and its affiliated companies filed a petition for bankruptcy in the District Court for the Southern District of New York.

168. And on May 14, 2009, in compliance with the Government-announced restructuring plan, Chrysler moved the Bankruptcy Court for rejection (termination) of the franchise agreements it had with 789 Chrysler dealers including Plaintiffs—about 25% of all Chrysler dealer franchises—and on June 9, 2009, the U.S. Bankruptcy Court issued the Rejection Order, providing that rejected dealers "shall have no further rights (direct, indirect, contractual or otherwise) to act as an Authorized Dealer . . . ."

169. By July 1, 2009, Plaintiffs had ceased doing business as franchised Chrysler dealers, having been deprived by the Government's actions of all contractual and statutory rights as Chrysler dealers.[121]

Nor is the Government accurate when it asserts that "[i]t was these allegations [as re-characterized by the Government] which the trial court properly – if understatedly – described as 'unusual,' without any precedent in takings law."[122]  The trial court never stated that this case was "without any precedent in

---

[121] JA 57–59.
[122] Def.'s Br. at 20.

takings law"—that is another of the Government's mischaracterizations.  What the trial court actually stated is:  "The dealers present unusual allegations that nevertheless create the prima facie feel of a takings case warranting just compensation,"[123] and that "the Supreme Court acknowledged that it has not been able to develop any set formula for recognizing a taking by the Government."[124] The trial court further stated that the Dealers should have the opportunity to develop a case that may turn out to be unique because takings cases are not limited to formulaic theories.[125]

An examination of the complaint itself—as opposed to the Government's mischaracterizations of the complaint—demonstrates that the allegations state a legally cognizable Fifth Amendment taking under Supreme Court authority such as *Armstrong v. United States*,[126] *International Paper Company v. United States*,[127] and *Louisville Joint Stock Land Bank v. Radford*[128]—as well as decisions of this Court such as *Shelden v. United States*.[129] As the Supreme Court has held:

> The courts have held that the deprivation of the former owner rather
> than the accretion of a right or interest to the sovereign constitutes the
> taking. Governmental action short of acquisition of title or occupancy

---

[123] JA 4.

[124] JA 4 (internal quotation marks omitted).

[125] JA 6.

[126]    *Armstrong v. United States*, 364 U.S. 40 (1960).

[127] *Int'l Paper Co. v. United States*, 282 U.S. 399 (1931).

[128] *Louisville Jt. Stock Land Bank v. Radford*, 295 U.S. 555 (1935).

[129] *Shelden* ,7 F.3d 1022 (Fed. Cir. 1993) (*abrogation on other grounds recognized at* 682 F.3d 1364).

has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking.[130]

## A.    The complaint alleges governmental action amounting to a Fifth Amendment taking of the Dealers' franchises

The Dealers' complaint alleges that the Government "rejected Chrysler's proposed restructuring plan and instead required that Chrysler 'rationalize' its dealer network by terminating a substantial number of dealer franchises using Section 363 of the Bankruptcy Code."[131]  This was a sovereign act for a legitimate government purpose:  "[T]o promote stability to the financial system of the United States."[132]

Paragraph 157 of the Dealers' amended complaint alleges the legal authority under which the President and the Secretary of the Treasury acted:

> In response to the global financial crisis, on October 3, 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 ("EESA") to restore liquidity and stability to the American "financial system."  12 U.S.C. § 5201(1).  Under the EESA, Congress created the Troubled Asset Relief Program ("TARP"), which granted the Secretary of the Treasury broad authority to purchase troubled assets from financial institutions.  12 U.S.C. § 5211(a)(1).[133]

Exercising his TARP authority, the Secretary determined that "companies engaged in the manufacturing of automotive vehicles" are financial institutions under

---

[130] *General Motors Corp.*, 323 U.S. at 359–360.

[131] JA 82.

[132] JA 79–80.

[133] JA 79.

TARP, and that purchase of their financial obligations "was necessary to promote stability to the financial system of the United States."[134]  Further, the Secretary then created the Automotive Industry Financing Program "to prevent a significant disruption of the American automotive industry that would pose a systemic risk to financial market stability and have a negative effect on the United States economy:"[135]

> The program requires, among other things, that participating institutions implement a plan to achieve long-term viability. Participating institutions also must adhere to rigorous executive compensation standards and other measures to protect the taxpayers' interests, including limits on the institution's expenditures and other corporate governance requirements.[136]

The complaint further alleges that when Chrysler submitted its viability plan (as required by the Automotive Industry Financing Program and Chrysler's loan agreement) for government approval, Chrysler did not propose any dealer franchise terminations nor did it propose any bankruptcy proceeding:  "The Chrysler Restructuring Plan did not call for the termination of Plaintiffs' dealer franchises or the filing of bankruptcy."[137]  But "[t]he Government rejected Chrysler's proposed restructuring plan and instead required that Chrysler 'rationalize' its dealer

---

[134] JA 79–80.

[135] JA 80.

[136] Financial Stability Oversight Board, FIRST QUARTERLY REPORT TO CONGRESS PURSUANT TO SECTION 104(G) OF THE EMERGENCY ECONOMIC STABILIZATION ACT OF 2008 at 18 (2008), *available at http://www.scribd.com/doc/11369943/Chief-Compliance-Officer-for-Tarp*.

[137] JA 81.

network by terminating a substantial number of dealer franchises using Section 363 of the Bankruptcy Code."[138]

Announcing the filing of the Chrysler bankruptcy, President Obama gave his reason for rejecting Chrysler's proposed restructuring plan (which did not call for dealer terminations):  "I rejected the original restructuring plan that Chrysler offered last month.  It was clear that if we put tax dollars in that plan, it would be a bad deal for American taxpayers and would not put the company on a viable path."[139]

So as required by the Government's restructuring plan (and not Chrysler's), Chrysler filed under Section 363 of the Bankruptcy Code and "on June 9, 2009, the U.S. Bankruptcy Court issued the Rejection Order, terminating the dealerships and further providing that rejected dealers 'shall have no further rights (direct, indirect, contractual or otherwise) to act as an Authorized Dealer . . . .'"[140]

This case falls squarely within the authority of the landmark case of *Armstrong v. United States*,[141] in which the Government exercised its contract right to take title to a partially finished ship, destroying Armstrong's lien for the value of

---

[138] JA 82.

[139] President Obama: The White House: Office of the Press Secretary: *Remarks by the President on the Auto Industry* (April 30, 2011).

[140] JA 82.

[141] *Armstrong v. United States*, 364 U.S. 40 (1960).

materials he had furnished for the ship.[142]  Once the United States got title to the

ship hulls, Armstrong's liens became unenforceable, destroying their value and

giving rise to his takings claim:

> Claiming valid liens on the hulls and manufacturing materials at the
> time they were transferred by Rice to the United States, petitioners
> asserted that the Government's action destroyed their liens by making
> them unenforceable and that this constituted a taking of their property
> without just compensation in violation of the Fifth Amendment.[143]

The Government's contractual arrangement with the shipbuilder, Rice, was

irrelevant to the takings analysis because Armstrong was not a party to that

contract:

> The Government also seems to suggest that because the contract
> between Rice and the United States expressly gave the Government
> the option of requiring a conveyance of title upon default, petitioners'
> liens attached subject to that limitation.  Petitioners, however, were
> not parties to the contract.[144]

The Supreme Court held that the Government's action had satisfied every possible

element of a Fifth Amendment taking:

> The total destruction by the Government of all value of these liens,
> which constitute compensable property, has every possible element of
> a Fifth Amendment 'taking' and is not a mere 'consequential
> incidence' of a valid regulatory measure.  Before the liens were
> destroyed, the lienholders admittedly had compensable property.
> Immediately afterwards, they had none.  This was not because their
> property vanished into thin air. It was because the Government for its

---

[142] *Armstrong*, 364 U.S. at 41.

[143] *Id.* at 41–42.

[144] *Id.* at 45–46.

own advantage destroyed the value of the lien . . . .[145]

Again, in *International Paper Company v. United States*,[146] the Secretary of War requisitioned all of the hydropower that Niagara Power Company could produce from the Niagara River. At the same time the Secretary and the power company entered into an agreement stating that the United States "waives delivery of the power to the United States on the express condition that the Power Company shall distribute such power as provided in a schedule naming companies and amounts."[147] The requisition and contract cut off the hydropower to International Paper's sawmill, shutting it down, and the company sued for a taking. In finding a taking of International Paper's water rights the Supreme Court flatly rejected the Government's argument that its contractual arrangement was not a taking:

> Then it is said that there was no taking, but merely a making of arrangements by contract. But all the agreements were on the footing that the Government had made a requisition that the other party was bound to obey. . . . The petitioner's right was to the use of the water; and when all the water that it used was withdrawn from the petitioner's mill and turned elsewhere by government requisition for the production of power it is hard to see what more the Government could do to take the use.[148]

And in *Louisville Joint Stock Land Bank*,[149] the Supreme Court held that a bankruptcy statute that deprived the bank of its pre-existing contract rights under a

---

[145] *Armstrong*, 364 U.S. at 48.
[146] *Int'l Paper Co. v. United States*, 282 U.S. 399 (1931).
[147] *Id.* at 405.
[148] *Id.* at 407 (citations omitted).
[149] *Louisville Jt. Stock Bank*, 295 U.S. 555 (1935).

mortgage constituted a taking, confirming that "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment."[150]

In *Boise Cascade Corporation v. United States*,[151] this Court recognized that obtaining a district court preliminary injunction could constitute the government action for a takings claim. And finally, in *Shelden v. United States*,[152] this Court found that, when the government obtained title to property using the judicial process for criminal asset forfeiture, its consequent destruction of the mortgage-holder's right to repayment through foreclosure was a taking:

> When the forfeiture order transferred all of Washington's interest in the property to the United States, the government took a property interest from the Sheldens for a public purpose. *See Shelden I,* 19 Cl.Ct. at 253 ("*in personam* forfeitures serve the public's interests in enforcing penal sanctions"). In accordance with the principles of the Fifth Amendment, the Sheldens must be compensated.[153]

**B.    The Government's argument that it was not acting in a sovereign capacity when it took the Dealers' franchises contradicts the well-pleaded allegations of the complaint and is not supported by the cases the Government cites**

Contrary to the Government's mischaracterization, the complaint does allege that the Government acted under sovereign statutory authority including the

---

[150] *Louisville Jt. Stock Bank*, 295 U.S. at 589.

[151] *Boise Cascade Corp. v. United States*, 296 F.3d 1339 (Fed. Cir. 2002).

[152] *Shelden*, 7 F.3d 1022 (Fed. Cir. 1993) (*abrogation on other grounds recognized at* 682 F.3d 1364).

[153] *Id.* at 1026.

Emergency Economic Stabilization Act,[154] the TARP,[155] and the Auto Industry

Finance Program,[156] for the public purpose of stabilizing and improving the

economy.  In *Kelo v. City of New London*,[157] the Supreme Court determined that

economic development (even when it financially benefitted private parties) was a

public purpose within the sovereign power of eminent domain.[158]  Nothing in the

Dealers' complaint supports the Government's assertion that in this case "the

United States was merely a commercial Actor"[159] or that "the Government action

described in the complaint was undertaken in a proprietary capacity."[160]  In making

this bald assertion—flatly contradicted by the complaint's allegations that the

Government was acting under statutory and regulatory authority—the Government

does not cite to a single word in the complaint.

In addition, this Court has stated that the proprietary/sovereign distinction,

while important in other contexts, is of little, if any, use in Fifth Amendment

takings cases:

> In whatever other context it may be useful, moreover, determination
> of whether the United States has acted in a proprietary or
> governmental-sovereign capacity is of little, if any, use in Fifth
> Amendment-just compensation analysis.  The purpose and function of

---

[154] 12 U.S.C. § 5201(1); JA 79
[155] 12 U.S.C. § 5211; JA 79.
[156] JA 80.
[157] *Kelo v. City of New London*, 545 U.S. 469 (2005).
[158] *Id.* at 484.
[159] Def.'s Br. at 21.
[160] *Id.* at 23.

the Amendment being to secure citizens against governmental expropriation, and to guarantee just compensation for the property taken, what counts is not what government said it was doing, or what it later says its intent was, or whether it may have used the language of a proprietor.  What counts is what the government *did*.[161]

Two eminent bankruptcy law scholars confirm that this was no ordinary commercial investment:  "[T]his was not an ordinary bankruptcy, because the government was lending on noncommercial, policy-oriented terms:"[162]

> The government created and funded a shell company that, through a § 363 sale from Chrysler, bought substantially all of Chrysler's assets for $2 billion, giving the secured creditors a return of 29 cents on the dollar.  FIAT was brought in to manage the new firm and was given a slice of the new company's stock.  New Chrysler (formally: New CarCo Acquisition LLC) then assumed the old company's debts to the retirees, most dealers, and trade creditors.  The $10 billion of unsecured claims owed to the retirees' benefits plan were replaced with a new $4.6 billion note as well as 55 percent of the new company's stock.[163]

The cases the Government cites do not support its claim that, in requiring Chrysler to terminate the Dealers' franchises and destroy their property rights, the Government was acting in its commercial capacity.  *Alaska Airlines*[164] was a suit over the Government's withholding payment to airlines under a contract giving

---

[161] *Yuba Gold Fields, Inc. v. United States*, 723 F.2d 884, 889 (Fed. Cir. 1983) (citations omitted) (emphasis in original).

[162] Mark J. Roe, David Skeel, *Assessing the Chrysler Bankruptcy*, 108 MICH. L. REV. 727, 733 (2010).

[163] *Id.*

[164] *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791 (Fed. Cir. 1993).

special rates for government travel—a garden variety contract suit. *Sun Oil*[165] was also a contract dispute in which this Court held that where the plaintiff has a contractual remedy, they may not also pursue a takings claim. *St. Christopher Associates*[166] also held that a takings claim does not lie when "remedies are provided by the contract."[167] And *Sol-G Construction Corporation*[168] held that the Government, as successor-in-interest to the bank's mortgage, holds the same priority position as the bank—and may exercise that priority as owner of the mortgage.

The Government incorrectly cites *Pennsylvania Coal Company v. Mahon*[169] for the proposition that "Government 'hardly could go on' if the law recognized takings claims by every third-party adversely affected by the United States' proprietary actions."[170] The actual quote from the case is: "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."[171] Likewise, the Government's citation to *Lingle v. Chevron*,[172] for the proposition that "[t]he Takings Clause does not insulate private parties from the indirect effects of

---

[165] *Sun Oil Co. v. United States*, 215 Ct. Cl. 716 (1978).

[166] *St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376 (Fed. Cir. 2008).

[167] *Id.* at 1385.

[168] *Sol-G Constr. Corp. v. United States*, 231 Ct. Cl. 846 (1982).

[169] *Pa. Coal Co. v. Mahon*, 260 U.S. 393 (1922).

[170] Def.'s Br. at 22.

[171] *Pa. Coal Co.*, 260 U.S. at 413.

[172] *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005).

Government action that occurs in a commercial or proprietary capacity,"[173] is

puzzling because that case says nothing about government actions taken in a

commercial or proprietary capacity.

### C. The Government's intentional destruction of the Dealers' franchises is a taking under *Omnia*

*Omnia Commercial Company v. United States*[174] does not stand for the

proposition that "only where the Government actually assumes a private party's

contract as its own does a taking occur,"[175] as the Government claims.  To the

contrary, the case held that if a contract is taken just compensation is due, but if the

contract is "injured or destroyed . . . without a taking, the government is not

liable."[176]

This Court recently described *Omnia*'s holding to be:  "As a general matter,

the government does not "take" contract rights pertaining to a contract between

two private parties simply by engaging in lawful action that affects the value of

one of the parties' contract rights.[177]

In *International Paper*,[178] the Supreme Court found a taking of the

company's water right consistent with *Omnia*, stating:

---

[173] Def.'s Br. at 23.

[174] *Omnia*, 261 U.S. 502 (1923).

[175] Def.'s Br. at 26.

[176] *Omnia*, 261 U.S. at 510.

[177] *Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1365 (Fed. Cir. 2009).

[178] *Int'l Paper Co. v. United States*, 282 U.S. 399 (1931).

We perceive no difficulty arising from the case of *Omnia Commercial Co. v. United States*. There the taking of the whole product of a company went no further than to make it practically impossible for that company to keep a collateral contract to deliver a certain amount of steel to the appellant. But here the Government took the property that the petitioner owned . . . .[179]

Directly contradicting the Government's position is *United Nuclear Corporation v. United States*,[180] which this Court recently discussed in *Palmyra Seafood*:[181]

> In *United Nuclear Corp. v. United States*, United, a uranium mining company, had a mining lease on Navajo land and submitted a mining plan to the Secretary of the Interior for approval.  The Secretary, however, refused to approve the mining plan until the Navajo Tribal Council approved the plan, and the Council declined to do so without the payment of additional funds to the Tribe.  The mining leases expired without United having been able to conduct any mining.[182]

Stating that the *United Nuclear* court had held that the Government had "seriously interfered with United's investment-backed expectations by destroying them,"[183] this Court explained that a taking occurred because the Government had effectively terminated United's mining contracts:

> The Secretary's action in *United Nuclear* effectively terminated a recognized real property interest—United's mining leases. *United Nuclear* was not a case in which a regulation of other property made United's mining operation more difficult or more expensive.[184]

---

[179]  *Int'l Paper Co.*, 282 U.S. at 408 (citation omitted).

[180]  *United Nuclear Corp. v. United States,* 912 F.2d 1432 (Fed. Cir. 1990).

[181]  *Palmyra Pac. Seafoods, L.L.C.*, 561 F.3d 1361.

[182]  *Id.* at 1367 (citation omitted).

[183]  *Id.* (*citing United Nuclear Corp.*, 912 F.2d at 1437).

[184]  *Id.* at 1367–1368.

And in *Louisville Joint Stock Land Bank*,[185] the Supreme Court held that the effects of a bankruptcy statute amounted to a taking because it destroyed specified contract rights of the mortgage-holder, rights that the Court took pains to identify in its decision.[186]

As these cases demonstrate, the Government is entirely wrong in asserting that the Dealers' allegations fail to state a claim under *Omnia* and its progeny.[187] Intentional destruction of the Dealers' franchises occurred when, as the Dealers allege, the Government required Chrysler (against its will) to terminate them. This governmental action constitutes a taking under cases like *Armstrong*,[188] *Louisville Joint Stock Land Bank*,[189] *United Nuclear*,[190] *International Paper*,[191] and *Shelden*.[192] In each of these cases the Government did not step into the shoes of the contracting party but nevertheless was held liable for a taking.

Finally, the Government gains no support from *T.O.F.C., Inc. v. United States*,[193] a case like *Omnia* in which the Government acquired the underlying

---

[185] *Louisville Jt. Stock Land Bank v. Radford*, 295 U.S. 555 (1935).

[186] *Id.* at 594–595.

[187] Def.'s Br. at 27.

[188] *Armstrong*, 364 U.S. 40 (1960).

[189] *Louisville Jt. Stock Land Bank*, 295 U.S. 555 (1935).

[190] *United Nuclear Corp.*, 912 F.2d 1432 (Fed. Cir. 1990).

[191] *Int'l Paper Co.*, 282 U.S. 399 (1931).

[192] *Shelden*, 7 F.3d 1022 (Fed. Cir. 1993) (*abrogation on other grounds recognized at* 682 F.3d 1364).

[193] *T.O.F.C., Inc. v. United States*, 683 F.2d 389 (Ct. Cl. 1982).

asset—railroad properties—which the plaintiff had a contract to manage.  Since the

contract was with the predecessor railroad owner and did not run with the property,

the plaintiff was left with a contract but nothing to manage.  Like *Omnia*, the

contract itself had not been taken, but the subject matter of the contract was:

> The central fact in this case is that what defendant took—the land and
> the facilities which were contained on it—was owned by Erie and not
> plaintiff.  The agreement held by plaintiff is in essence a service
> contract with Erie to operate the facilities.[194]

### D.    The Government's allegation that Chrysler was acting within its own discretion impermissibly raises an issue of fact and contradicts the complaint

The complaint does not allege, and there is simply no factual support for, the

Government's bald assertion that Chrysler was acting within its own discretion.

Nor does the complaint allege (and the Government has cited nothing to support its

claim) that "Chrysler was (1) acting independently, and (2) not undertaken with

Governmental authority [sic]."[195]

To the contrary, the complaint alleges that Chrysler submitted a viability

plan that did not call for dealer terminations and that the Government nonetheless

required Chrysler to terminate the Dealers' franchises.  Because in a motion to

dismiss the Government must accept as true the allegations of the complaint,[196] the

---

[194]  *T.O.F.C., Inc.*, 683 F.2d at 191.

[195]  Def.'s Br. at 30.

[196]  *Cambridge*, 558 F.3d at 1335 (*citing Papasan*, 478 U.S. at 283; *Gould, Inc.*, 935 F.2d at 1274).

Government is not entitled to dismissal of this action by contradicting those allegations or claiming they are untrue.  It is well settled that if the moving party puts forth facts that contradict those facts presented by the non-movant in a motion to dismiss, the movant's facts are not to be considered by the court—they are irrelevant to the motion to dismiss.[197]

The Dealers' allegations are also plausible.  As the Special Inspector General for the Trouble Assets Relief Program reported to Congress, the Bankruptcy Code was simply the tool the Government's Auto Team chose to use in order to quickly terminate the franchises:

> [T]he Auto Team felt the companies' best chance of success required "utilizing the bankruptcy code in a quick and surgical way" and noted further that it would have been a "waste of taxpayer resources" for the auto manufacturers to exit bankruptcy without reducing their networks.[198]

Steven Rattner, Head of the Auto Team, explained why the Government required Chrysler to use the bankruptcy process:

> I had doubted whether fundamental restructurings could be accomplished outside of bankruptcy. While certain changes, like renegotiating labor agreements, could be done without it because only a single point of negotiation was required, other important steps, like

---

[197] *See, e.g.*, *Advanced Cardiovascular Sys., Inc.*, 988 F.2d at 1161 (Fed. Cir. 1993).

[198] Statement of Neil Barofsky, Special Inspector General to the Trouble Assets Relief Program, before the Senate Committee on Finance (July 21, 2010), *available at* http://www.sigtarp.gov/Testimony/Testimony%20Before%20the%20Senate%20Committee%20on%20Finance_7_21_2010%20Final.pdf.

trimming dealer networks and reducing debt, involved innumerable individual actors and would be very difficult to implement absent the cleansing nature of bankruptcy.[199]

Rattner further observed that the Government's "best idea was to employ a little-used part of the Bankruptcy Code, Section 363, which greatly streamlines the process by allowing a newly formed company to buy the operating assets from the bankrupt entity."[200]  In his book, Rattner states that the Government chose Bankruptcy Court over legislation after being advised that shortcutting the bankruptcy process might lead to takings liability:

> Finally we were advised that efforts to shortcut bankruptcy procedures could well run afoul of the 'takings clause' of the U.S. Constitution, or at least lead to prolonged litigation over the law's constitutionality, resulting in delays that would almost certainly exceed those involved in a Chapter 11 filing.[201]

Neither *Erosion Victims of Lake Superior Regulation v. United States*,[202] nor *B & G Enterprises, Ltd. v. United States*,[203] is to the contrary because  both involved the independent actions of a sovereign—the International Joint Commission and the State of California respectively, acting independently of the

---

[199] Steven Rattner, *The auto bailout: How we did it*, FORTUNE MAGAZINE, Nov. 23, 2009 *available at* http://money.cnn.com/2009/10/21/ autos/auto_bailout_ rattner.fortune.

[200] *Id.*

[201] Steven Rattner, OVERHAUL:  AN INSIDER'S ACCOUNT OF THE OBAMA ADMINISTRATION'S EMERGENCY RESCUE OF THE AUTO INDUSTRY 107 (2010).

[202] *Erosion Victims of Lake Superior Regulation v. United States*, 833 F.2d 297 (Fed. Cir. 1987).

[203] *B & G Enters., Ltd. v. United States*, 220 F.3d 1318 (Fed. Cir. 2000).

United States.  There is no independent action by another sovereign in this case—
only the actions of the United States requiring Chrysler to terminate the Dealers'
franchises.

### E.    The Dealers have alleged the elements of a takings claim and that is all that is required for their claim to go forward

The Government's final argument, that this case should be dismissed "even
if the Court concludes that the plaintiffs have properly alleged a cognizable
property interest and sufficient Government conduct to permit a takings claim to
go forward,"[204] is without merit.  Once a plaintiff has alleged the elements of the
cause of action, the requirements of RCFC 8 have been satisfied.  As the Supreme
Court stated in *Iqbal*:

> As the Court held in *Twombly*, the pleading standard Rule 8
> announces does not require "detailed factual allegations," but it
> demands more than an unadorned, the-defendant-unlawfully-harmed-
> me accusation.[205]

Nor does RCFC 8 require that a plaintiff, in order to state a cause of action,
allege a legal theory as the Government contends.  Rule 8 states three requirements
for a valid complaint, all of which have been satisfied here.[206]  The Government
cites to no authority that, in addition to the three elements required by Rule 8, a
plaintiff must also allege a legal theory.

---

[204] Def.'s Br. at 38.
[205] *Iqbal*, 556 U.S. at 677–678 (internal citations omitted).
[206] RCFC 8.

This Court has held that there is "a two-part test to determine whether a taking has in fact occurred."[207]  "First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment. . . . Second, after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest."[208]  Having amply alleged these facts, the Dealers have met all the requirements of RCFC 8 and are entitled to proceed with their claims.

---

[207] *Am. Pelagic Fishing Co.*, 379 F.3d at 1372.
[208] *Id.*

## CONCLUSION

For all these reasons, the Dealers urge this Court to affirm the trial court's denial of the Government's motion to dismiss these claims under Rule 12(b)(6) or alternatively to allow them to amend the complaint.

Respectfully submitted,

  /s/  Nancie G. Marzulla
Nancie G. Marzulla
Roger J. Marzulla
Marzulla Law, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)
nancie@marzulla.com
roger@marzulla.com

Dated:  May 13, 2013          Counsel for Plaintiffs-Appellees

Of counsel:

Leonard A. Bellavia
BELLAVIA, BLATT, ANDRON & CROSSETT, PC
200 Old Country Road
Mineola, NY 11501
(516) 873-3000 (telephone)
(516) 873-9032 (facsimile)
LBellavia@DealerLaw.com

# United States Court of Appeals
## for the Federal Circuit
*ALLEY'S OF KINGSPORT v US,* 2013-5019

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by MARZULLA LAW, LLC, Attorneys for Appellees to print this document. I am an employee of Counsel Press.

On **May 13, 2013**, Counsel for Appellees has authorized me to electronically file the foregoing **Brief of Plaintiffs-Appellees** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Kenneth Dintzer
Sarah Bienkowski
Seth W. Greene
David A. Harrington
Elizabeth Marie Hosford
Daniel Brett Volk
Department of Justice
P.O. Box 480
Attn: Classification Unit, 8th Floor
Ben Franklin Station
Washington, DC 20044
202-307-1111
kenneth.dintzer@usdoj.gov
sarah.m.bienkowski@usdoj.gov
Seth.Greene@usdoj.gov
david.harrington@usdoj.gov
matthew.f.scarlato@usdoj.gov
Daniel.B.Volk@usdoj.gov

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

May 13, 2013                                   /s/ Robyn Cocho
                                               Counsel Press

## Certificate of Compliance

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 12,974 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared using a proportionally spaced typeface us Microsoft Word 2010 in a 14 point Times New Roman font.

Respectfully submitted,

 /s/  Nancie G. Marzulla   
Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)
nancie@marzulla.com
roger@marzulla.com

Dated:  May 13, 2013          Counsel for Plaintiffs-Appellees